UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | |
|---|---|
| T.H., by his parent and natural guardian TIESHA SHEPHERD,<br><br>      Plaintiff,<br><br>      v.<br><br>CITY OF SYRACUSE; SERGEANT DENNIS REGIN, in his individual and official capacities; and OFFICER ANTHONY FIORINI, in his individual and official capacities,<br><br>      Defendants. | **SECOND AMENDED COMPLAINT**<br><br>17-cv-1081 (GTS/DEP)<br><br>**JURY TRIAL DEMANDED** |

------------------------------------------------------------ x

**PRELIMINARY STATEMENT**

  1.  This civil rights action challenges the Syracuse Police Department's dangerous failure to recognize that chokeholds can kill and therefore can only be lawfully used in the most extraordinary of circumstances. Because of this failure, Syracuse police officers are using lethal chokeholds unlawfully, including against children. One such victim is the plaintiff T.H., who on his fourteenth birthday was assaulted by one Syracuse police officer who violently grabbed T.H. by his neck, placed him in a chokehold, and made him lose consciousness and another Syracuse police officer who slammed his face into the ground when he posed no threat to officers or to others.

  2.  The Syracuse Citizen Review Board (the CRB), the civilian agency overseeing the Syracuse Police Department (the SPD), has regularly criticized the SPD's use-of-force policy and noted that the "lack of specific policy guidance on the appropriate use of force may lead

1

officers and supervisors to believe that they are justified in using force in situations in which it would be unreasonable or unnecessary." In recent years, the CRB proposed several reforms, including a clear prohibition of chokeholds in situations that do not warrant the use of lethal force. The SPD has ignored these detailed recommendations.

3.      Chokeholds are dangerous maneuvers that have resulted in the death or serious injury of individuals in police custody. For example, a New York City Police Department officer killed Eric Garner with a chokehold in July 2014. This highly publicized incident in Staten Island, New York prompted a national discussion on the use of chokeholds and other extreme types of force by police departments. In dozens of cities around the nation, including New York City, Los Angeles, Washington, D.C., Detroit, Philadelphia, Plano (TX), and Jacksonville (FL), police departments have recognized the lethal nature of chokeholds and either banned them outright or tightly restricted their use.

4.      Of particular concern here, the SPD's grossly inadequate use-of-force policy governs the behavior of School Information Resource Officers, including defendant Sergeant Regin, an SPD officer assigned to protect students' safety in Syracuse public schools.

5.      Defendants' policies and actions violated T.H.'s rights under the Fourth Amendment of the United States Constitution, the New York Constitution, and common law. Due to this violent incident on plaintiff's birthday, T.H. suffered physical injury, humiliation, and trauma. T.H. seeks relief to redress these harms.

## PARTIES

Plaintiff

6. Plaintiff T.H. is a sixteen-year-old student and resident of Syracuse, New York. At the time of the events alleged herein, T.H. was a fourteen-year-old, first-year student at Corcoran High School. He appears in this action by and through his mother, Tiesha Shepherd.

Defendants

7. Defendant CITY OF SYRACUSE controls and is responsible for the actions of the Syracuse Police Department and its officers.

8. Defendant SERGEANT DENNIS REGIN is a police officer employed by the Syracuse Police Department and serves as the Director of the School Information Resource Officers (SROs) in the Syracuse City School District. At all times relevant to this complaint he was acting in the course and scope of his employment with the Syracuse Police Department. He is sued in his individual and official capacities.

9. Defendant OFFICER ANTHONY FIORINI is a police officer employed by the Syracuse Police Department. At all times relevant to this complaint he was acting in the course and scope of his employment with the Syracuse Police Department. He is sued in his individual and official capacities.

## FACTS

**Chokeholds Are Highly Likely to Cause Death or Serious Physical Injury**

10. Chokeholds are techniques that involve applying pressure to the neck to subdue an individual, causing him or her to lose consciousness or the ability to breathe.

11. Subjects of a chokehold feel helplessness and pain.

12. It is difficult for an officer to monitor and control the amount of pressure applied during a chokehold.

13. Chokeholds have caused death and paralysis, especially when applied improperly. These incidents have prompted a national discussion regarding the propriety of police officers using chokeholds to subdue people.

14. The likelihood of an improperly applied chokehold, and fatal consequences, is greatly increased when an individual struggles while placed in these types of holds. Such a struggle is a natural response to a chokehold's physical effects: the inability to breathe and disruption of blood flow to the brain. It is also a natural response to chokeholds that are applied without provocation or warning.

15. Young people and individuals with preexisting health conditions are at increased risk of adverse effects of a chokehold.

16. Police departments around the nation have either banned chokeholds or limited their application to situations that warrant the use of deadly force.

17. Cities with police departments banning or curtailing the use of chokeholds include New York City, Los Angeles, Washington, D.C., Detroit, Philadelphia, Plano (TX), and Jacksonville (FL). For example, the Miami Police Department has a policy stating, "Police officers are prohibited from utilizing the Lateral Vascular Neck Restraint (LVNR), chokehold, neck hold, and/or any other restraint that restricts free movement of the neck or head." The police department for Tulsa, Oklahoma refers to chokeholds as Lateral Vascular Neck Restraints (LVNR) in its use-of-force policy. This policy defines the LVNR as "any choke, sleeper, or similar hold that is intended to disrupt the flow of blood or oxygen to the brain which would

result in the temporary loss of consciousness." The policy also prohibits chokeholds noting that "the use of LVNR or a similar neck restraint is not authorized."

18. The Police Executive Research Forum (PERF), a nationally recognized police research and policy organization, recently recommended that the police department of Fairfax County, Virginia revise its policies to prohibit the use of chokeholds as a use-of-force option. According to a 2015 PERF report, the Fairfax County Police Department has issued a directive implementing PERF's recommendation.

19. The Civil Rights Division of the United States Department of Justice considers chokeholds to be lethal force, which they have defined as "the use of force likely to cause death or serious injury." The DOJ has frequently required police departments to adopt policies that prohibit the use of chokeholds, except in situations where lethal force is authorized.

20. Routine, rigorous training is needed to maintain minimum levels of proficiency in the use of chokeholds.

### Syracuse Police Officers' Unlawful Use of Force

21. T.H. began attending Corcoran High School as a freshman alongside his twin brother T.M.H. in September 2016.

22. ▮REDACTED▮ 2016 marked the fourteenth birthday of T.H. and T.M.H.

23. T.H. and T.M.H. were heading home from school on ▮REDACTED▮ 2016 when a fistfight broke out between two pairs of Corcoran students.

24. T.H. and T.M.H. intervened in this fight and separated J.W. and H.S. from D.S. and D.A. This fight was taking place near J.T. Roberts School, which enrolls children in kindergarten through eighth grade. T.H. and T.M.H. intervened out of concern for the younger elementary school students that were leaving school at that time.

25. T.H. and T.M.H. continued walking downhill, together with the dozens of students walking home from school.

26. When the students reached the bottom of the hill, some of the students from the earlier fight began to fight again.

27. By this point, several SPD officers had arrived on the scene. Over fifty students were still in the vicinity.

28. Officer Paul Rose, an SPD officer serving as an SRO, violently arrested D.A. after slamming him onto the ground and shoving his knee into his neck.

29. Officer Rose then inexplicably pointed out T.M.H. among a crowd of the thirty to fifty students who were making their way home from school. In this moment, T.M.H. was standing still a couple of feet away from Officer Rose and the arrested student. He was not doing anything except observing the arrest.

30. T.H. turned his back at this moment because he did not also want to be unfairly targeted by the police.

31. When T.H. turned around toward T.M.H. again, he was confused to see his brother being walked toward a patrol car by a man in plainclothes. T.H. later learned that the man in plainclothes was Sergeant Regin.

32. T.H. rushed over concerned about the well-being and the safety of his brother. He tried to grab his brother because he believed his brother had done nothing wrong.

33. T.H. followed the officers and his brother to the rear end of the patrol car and continued trying to grab his brother. T.H. wanted to go home to celebrate their fourteenth birthday.

34.     At the patrol car, T.H.'s best friend Y.B. tried to pull T.H away from T.M.H., but T.H. pulled away from her because he remained concerned about what was happening to his brother, especially after watching the violent arrest of D.A.

35.     T.H. asked what was happening to his brother and explained that his brother had not done anything wrong. No officer explained why his brother was singled out.

36.     Within less than a minute of T.H. reaching for his brother, Sergeant Regin placed T.H. in a chokehold from behind.

37.     Sergeant Regin knew that T.H. was one of the many students leaving school for the day.

38.     At the time of the incident, T.H. weighed approximately 130 pounds and was physically dwarfed by Sergeant Regin and the other officers. Approximately fifteen officers were on the scene at that time. T.H. was not armed, nor was he carrying anything that could be used as a weapon.

39.     Sergeant Regin did not issue a warning or an order that he would use a chokehold to put T.H. in custody.

40.     Sergeant Regin did not attempt to use lesser force to place T.H. in custody.

41.     After placing T.H. in a chokehold, Sergeant Regin dragged T.H. and—with his arm still around T.H.'s neck—threw T.H. down, slamming T.H. to the ground. In grabbing, dragging, and throwing T.H., Sergeant Regin kept his forearm around T.H.'s neck. Sergeant Regin maintained this hold for over forty-five seconds.

42.     T.H. felt tremendous pressure on the front of his neck.

43.     T.H. could not breathe and was unable to get air.

44.     T.H. suffers from asthma.

45. T.H. lost consciousness and recalls that everything "went black."

46. When T.H. regained consciousness, Sergeant Regin was still on the ground restraining T.H. with his arms around him.

47. T.H. felt pain throughout his body, especially in his neck. He also felt numbness in his face. Scared and panicked, T.H. yelled for help.

48. Feeling one of his arms being moved to his back, T.H. tried to move his other arm behind his back to comply with the officers. No officer had announced that he was under arrest.

49. Nonetheless, Officer Fiorini slammed his knee on T.H.'s back and neck, smashing T.H.'s chin on the ground and splitting it open.

50. An unidentified female officer placed handcuffs on T.H.

51. In pain and bleeding freely from the gash in his chin, T.H. requested to be brought to a hospital and requested a paper towel. Sergeant Regin ignored these requests.

52. After learning about the chokehold from multiple phone calls, T.H.'s mother, Tiesha Shepherd, drove to the scene of the incident and found her son bloodied and crying in the back of a police car.

53. Distraught, Ms. Shepherd tearfully asked Sergeant Regin if the police were bringing T.H. to the hospital. In response, Sergeant Regin yelled at her to get away from the car and threatened to arrest her.

54. The officers brought T.H. and his brother to the local police station, stopping along the way to arrest at least one other student.

55. His mother brought T.H. for medical attention to SUNY Upstate Medical University Hospital after T.H. was released from the police station. She also brought him to his pediatrician the next day.

56.     T.H. suffered from a gash to his chin, which has left a permanent scar. He experienced pain in his neck, head, shoulder area, knees, and legs. He suffered from a bruised arm and leg.

57.     T.H. also suffered emotional distress from this incident. The actions of Sergeant Regin and Officer Fiorini traumatized T.H. on his birthday. During the incident, T.H. feared he would become yet another black male killed at the hands of the police. Afterward, T.H. experienced two visceral nightmares where the police killed him. T.H. no longer trusts police officers despite once wishing to become one.

58.     On November 28, 2016, petitions were filed with the Onondaga County Family Court alleging that T.H. and T.M.H. committed acts, which if done by an adult, would constitute resisting arrest and obstructing governmental administration in the second degree.

59.     The narrative in the arrest report, completed on the date of the incident, does not describe any unlawful behavior by T.H. or T.M.H. prior to the chokehold by Sergeant Regin.

60.     On December 20, 2016, T.H. served a notice of claim upon the City of Syracuse Law Department, pursuant to section 50-e of the New York General Municipal Law. On February 28, 2017, T.H. appeared for his hearing pursuant to Section 50-h of the New York General Municipal Law.

**The Use-of-Force Policy Fails to Account for Youth and the Deadliness of Chokeholds**

61.     The SPD use-of-force policy provides inadequate guidance on the use of deadly force.

62.     It states, "It is the responsibility of each officer to be aware of the requirements of Article 35.00 of the New York State Penal Law and to guide their actions based upon that law, the US Supreme Court decision in Tennessee v. Garner and Departmental policy and training.

The intentional discharge of a firearm will always be considered to be the use of deadly physical force. However, deadly physical force can be expanded to include the use of other weapons and force if the intent is to cause serious physical injury. This shall include, but is not limited to, impact weapons such as batons, flashlights, motor vehicles, and bare hands."

63. The SPD use-of-force policy provides no additional guidance on when deadly force is justified. The policy only addresses highly specific situations, such as when an officer can fire at a moving vehicle. All of these situations involve the use of a firearm.

64. The use-of-force policy is silent on chokeholds. It does not prescribe how to use them or provide explicit guidance on when they may be used. Specifically, the policy does not note the circumstances in which officers should employ a chokehold, the placement of chokeholds on the use-of-force spectrum, whether officers should provide a warning prior to employing a chokehold, and whether officers should attempt to use other, less-lethal force prior to employing a chokehold.

65. The use-of-force policy prohibits officers from differentiating between children and adults in the exercise of deadly force. It notes, "Juveniles – No distinction shall be made relative to the age of the intended target of deadly physical force."

66. The SPD policy is materially less detailed than use-of-force policies found in other police departments or the model policies of law enforcement organizations.

67. The SPD has been repeatedly notified that its use-of-force policy is grossly deficient. Prior to T.H.'s encounter with the SPD, the Syracuse CRB had issued numerous reports outlining instances of excessive force, criticizing the SPD use-of-force policy, and recommending a new use-of-force policy that would minimize the likelihood of officers using force when it is unreasonable or unnecessary.

68. In 2014, the CRB sustained a finding of excessive force against an SPD officer who used a chokehold on a man without justification. In 2015, the CRB issued a report calling for the express ban of one type of chokehold and for another type of chokehold to be expressly limited to situations where deadly force is justified. In early 2016, the CRB proposed specific language for a reformed use-of-force policy, including a clear prohibition on chokeholds in situations that do not warrant the use of lethal force.

69. The SPD did not adopt any of the CRB's recommendations regarding the department's use-of-force policy.

70. The violation of T.H.'s rights resulted from these constitutionally deficient use-of-force policies. The policy provides insufficient guidance on when to use a chokehold and other techniques that are only appropriate when deadly force is authorized. Additionally, the policy impairs the ability of SPD officers to account for a juvenile's age in determining the appropriate use of force.

### Syracuse Police Officers Receive No Training Related to Chokeholds

71. In 2015, the New York Civil Liberties Union made a Freedom of Information Law request to the SPD concerning training materials used for cadets and officers in service. In particular, the NYCLU requested all training materials from 2012 to mid-2015 concerning the "use of force, including but not limited to materials that address the circumstances under which the use of force is permitted" and "de-escalation strategies and tactics."

72. In 2016, the New York Civil Liberties Union received nearly 600 pages of training materials responsive to this request.

73. The training materials do not instruct officers on how to do a chokehold, when chokeholds are prohibited, and when a subject might be more vulnerable to serious injury or

death. The materials do not speak to the circumstances in which officers should employ a chokehold, the placement of chokeholds on the use-of-force spectrum, whether officers should provide a warning prior to employing a chokehold, and whether officers should attempt to use other, less-lethal force prior to employing a chokehold.

74. The violation of T.H.'s rights also resulted from the improper training of Sergeant Regin. Upon information and belief, SPD officers are not trained and instructed on how to use chokeholds or on the risks and dangers of chokeholds.

## JURY DEMAND

75. The plaintiff demands a jury trial on all of his claims.

## JURISDICTION AND VENUE

76. This action is brought pursuant to 42 U.S.C. § 1983. Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1343(a)(3). This Court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367(a).

77. Venue is proper in the United States District Court for the Northern District of New York under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims in this action occurred in this District.

## CAUSES OF ACTION

78. The acts, omissions, and policies of the defendants violated T.H.'s rights under the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983.

79. The acts, omissions, and policies of the defendants violated T.H.'s rights under Article I, Section 12 of the New York Constitution.

80. The acts, omissions, and policies of the defendants violated T.H.'s rights under New York common law to be free from assault and battery.

## REQUESTS FOR RELIEF

WHEREFORE the Plaintiff respectfully requests that the Court:

A.      Assume jurisdiction over this matter;

B.      Find that defendants' actions violated T.H.'s rights under the Fourth Amendment of the United States Constitution and entitle T.H. to compensatory relief;

C.      Find that defendants' actions violated T.H.'s rights under Article I, Section 12 of the New York Constitution and entitle T.H. to compensatory relief;

D.      Find that defendants' actions violated T.H.'s rights under New York common law and entitle T.H. to compensatory relief;

E.      Award T.H. reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

F.      Grant any other relief the Court deems necessary and proper.

Respectfully submitted,

s/ Kevin Jason
KEVIN JASON (Bar No. 520829)
ERIN BETH HARRIST (Bar No. 517604)
CHRISTOPHER DUNN (Bar No. 513828)
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
Tel: (212) 607-3300
Fax: (212) 607-3318
kjason@nyclu.org

Counsel for Plaintiff

Dated:    November 2, 2018
           New York, N.Y.